ARVIN N. CRITTENDEN *vs.* EUGENE FIELD & another.

This court has jurisdiction in equity to restrain the obstruction of a mill privilege by another mill on the same stream.

An order of a single judge of this court, sitting in equity, directing an issue of fact to be tried by a jury, is not open to exception.

A conveyance of one of two ancient mills, which comprise the entire mill privilege of a stream, carries with it such a proportion of the whole right in the stream as the water used to drive the mill conveyed bears to that used by the other mill.

Under a grant of a mill privilege, "commencing at a certain permanent rock on which the upper dam belonging to the grist mill now stands, thence running on said brook to the dam occupied for supplying water to the grist mill, with the privilege of erecting buildings on the adjacent land belonging to the grantor, for any purpose except for a grist mill and saw mill, for the occupation and use of any other machinery carried by water power, reserving therefrom the right of taking water from the said upper dam to the grantor, also reserving to the grantor the land on said brook one hundred feet below said permanent rock," the grantee has no right to raise the water above the permanent rock, or to erect a dam within one hundred feet of the upper dam.

Deeds of land bounding on a stream do not affect previous independent conveyances of all the water power therein.

The admission of parol evidence corresponding with the legal interpretation of a deed is no ground of exception.

ACTION OF TORT, under *St.* 1853, *c.* 371, praying for damages and for other relief in equity, by the owner and occupant of a water privilege on Mill Brook in Charlemont, "extending," as he alleged, "from the grist mill dam, so called, to and above the upper dam, so called, with all the water power created by and rightfully to be used with both said dams," subject to a right of the defendants to construct and maintain a dam between these two, and not within one hundred feet of the upper dam, nor so high as to affect the water power created by the upper dam, or to obstruct the natural flow of the water above a certain permanent rock lying westerly of the centre of the brook, and constituting a part of the foundation of the upper dam; which limits, the plaintiff alleged, the defendants had exceeded in a dam maintained by them for ten years; and thereby injured the plaintiff's mills.

The defendants answered, setting up a right to do all that they had done, and denying all the plaintiff's allegations; and at the hearing before *Metcalf,* J., in Franklin at September term

1857, before the case was sent to the jury, " objected to being sent to the jury on issues of fact, and moved that the case be dismissed, because it appeared upon the face of the declaration and answers that there was a dispute as to the title in a water privilege ; and also because it appeared that the defendants had been in possession at least ten years, and relief was not sought to prevent irreparable damage ; and also because the plaintiff had adequate remedies at law, if he had sustained any damage." But the court refused to dismiss the complaint, and ordered the parties to go to the jury upon these issues : " The jury shall find whether the plaintiff has a water privilege, as alleged in his complaint, and also whether said privilege has been obstructed by the defendants, or either of them, as alleged in the complaint, and what damage, if any, the plaintiff has sustained from such obstruction."

The evidence of title was as follows :

In 1788, Sylvanus Rice, being the sole owner of the water privilege, conveyed to Jonathan Hawks about ninety acres of land, " together with a grist mill and saw mill, and the privilege of the stream upon which they stand, eighty rods below the south line of Hawks's forty acre lot, so called, through which it runs, with liberty to use and improve said stream for mills of all sorts within the eighty rods, with liberty to pass and repass by such ways and means as are convenient, with convenient yard room for the use of mills of all sorts."

In 1793, Jonathan Hawks conveyed to Artemas Rice, 2d, " one half of a saw mill and half the privilege of the stream on which it is set," " together with liberty to use and improve said stream for mills of all sorts as far up as the tail of the grist or corn mill standing on said stream, and as far down said stream as the distance of eighty rods below the south line of Jonathan Hawks's farm," &c., with liberty to pass and repass, and " with convenient yard room for the use of the mill." The interest of Rice came by mesne conveyances to David Crittenden in 1846.

In 1804 Jonathan Hawks conveyed to Silas Beckwith the grist mill, with all the grantor's right to the mill stream, subject

to Rice's right to take water from the upper dam for the use of his saw mill, when it would not injure the grist mill; Beckwith " to have sufficient room for mill yards, dams and ponds, and the command of the upper pond only the reserve made for Rice." Beckwith's interest came by mesne conveyances to Simeon Crittenden, who on the 16th of March 1816 conveyed to David Crittenden the grist mill, " with the full use of the stream of water," subject to Rice's privilege as above.

In 1826 David Crittenden, being thus possessed of the grist mill, and having otherwise acquired title to the one half of the saw mill which had not been conveyed to Rice, conveyed to Silas Hawks and others the grist mill and land attached thereto, and all water privileges which were conveyed to him by Simeon Crittenden, and also one undivided half of the saw mill which he owned in company with Artemas Rice, and all the privileges conveyed to him therewith.

By two deeds dated July 21st 1834 said Silas Hawks and others conveyed to William Patch and Eugene Field " a certain water privilege, commencing at a certain permanent rock westerly of the centre of said brook, on which the upper dam belonging to the grist mill now stands, and thence running on said brook to the dam which is occupied for supplying water for the grist mill, with the privilege of erecting buildings on the adjacent land for any purpose, except a grist mill and saw mill, for the occupancy and use of any other machinery carried by water power ; reserving the right of taking the water from said upper dam to ourselves ; also reserving to ourselves the land on said brook one hundred feet below said permanent rock, and also the right of raising the grist mill dam one foot higher than it now is."   This privilege is now by mesne conveyances vested in the defendants.

In 1841 said Silas Hawks and others conveyed to David Snow " a grist mill erected by David Crittenden, with all the land attached thereto, and the right of the road leading thereto, and all the water privileges which the said David Crittenden owned on said stream, conveyed to him by Simeon Crittenden March 16th 1816, excepting the water privilege sold to Eugene

Field; and also the first privilege in the saw mill of drawing water sufficient to carry a carding machine;" and also the saw mill and all privileges conveyed therewith to David Crittenden. Snow's interest became vested by mesne conveyances in David Crittenden in 1848.

In 1852 David Crittenden conveyed to David B. Crittenden " one half of my grist mill and saw mill, and lands thereto belonging"; and in 1853 he conveyed to the plaintiff " one undivided half of the grist mill and one undivided half of the saw mill, together with one undivided half of the water privileges, lands and appurtenances thereto belonging." And David B. Crittenden's half of the grist mill was since conveyed to the plaintiff.

In 1854 the plaintiff and David B. Crittenden conveyed to Bishop the saw mill, " with all the privilege of the stream on which said mill stands, together with liberty to use and improve said stream for mills of all sorts except grist mills, which we reserve for our own use and benefit on the grist mill privilege above."

In 1804, Quartus Rice conveyed to Joseph White the land on the west side of the brook, and bounding " on the brook," from a point above the upper dam to a point below the saw mill. In 1817 Jonathan Hawks conveyed to Urbane Hitchcock a farm, which included land on the eastern bank of the stream, from the line of the upper dam to a place below where the defendants' dam now is; with no reservation in the deed. This land, by mesne conveyances, came to the defendants in 1849.

A part of the western portion of the dam built by the defendants was less than one hundred feet from the upper dam, and the dam so erected by the defendants raised the water at, about or above the permanent rock referred to in the deeds of Hawks and others to Patch and Field, to the height of ten feet above the ordinary level of the water as it stood when said deed was given. The power of using the upper dam for any purpose, excepting as a reservoir, was impaired or destroyed in value by the setting back of the water as aforesaid; and the plaintiff contended that its value even for that purpose was destroyed.

Crittenden *v.* Field & another.

There was no evidence of any occupation for fifty years by the owners of the grist mill, on either side of the stream, between the grist mill and the upper dam, except by passing along the bank to repair and regulate the flow of water from the upper dam, and by building and using a carding mill above the grist mill; but it appeared that both banks of the stream had been occupied for agricultural purposes, by Jonathan Hawks and his assigns and Joseph White and his assigns, except so far as occupied for manufacturing purposes. It did not appear that any use of the water privilege had ever been made by the owners of the adjacent lands, unless claiming under deeds of the mill privileges; or that the privilege created by the upper dam had ever been used except as a reservoir to the grist mill.

There was parol evidence that the reservation in the deed of Hawks and others to Patch and Field was expressly stated at the time of the execution of the deed in Patch's hearing, and was known to Field when he took the deed, to be intended to save to the grantors a privilege just below the upper dam.

It appeared that the defendants' dam materially impaired the value of this privilege thus intended to be reserved; and there was conflicting evidence upon the question, whether the defendants' dam obstructed the working of the grist mill.

Upon this evidence the defendants contended, 1st. That the plaintiff had not chosen an appropriate remedy; 2d. That the limitations in the deeds to Patch and Field, under which they claimed, did not legally restrain them from constructing a dam within one hundred feet of the upper dam of the plaintiff, nor from raising the water at, about and over the permanent rock described in said deed; 3d. That the reservation of the land on the brook, one hundred feet below the permanent rock, was inoperative and void; 4th. That, since acquiring title in the privilege from Hawks and others, they had acquired a good title to the eastern bank of the brook, including the one hundred feet reserved, and as far up as the upper dam, and had thus acquired a right to maintain their dam at its present height.

On the whole evidence the court ruled, that the plaintiff had proved his title to such a privilege as he claimed against the de-

fendants; and that the jury, if satisfied that the plaintiff had been injured by any acts of the defendants, should return their verdict for such damages as he had sustained. The jury returned a verdict for the plaintiff, and the defendants alleged exceptions.

*S. T. Field*, for the defendants.

*G. T. Davis*, for the plaintiff.

BIGELOW, J. This case is clearly within the equity jurisdiction of this court. *Bemis* v. *Upham*, 13 Pick. 170. *Ballou* v *Hopkinton*, 4 Gray, 328. It has been heard before a single judge, and an issue to try certain questions of fact has been directed by him. It was within his discretion to decide on the motion of the plaintiff for an issue to the jury; and his order for such issue is not open to exception. *Ward* v. *Hill*, 4 Gray, 593.

The questions raised at the trial concerning the respective rights of the parties to the mill privileges in controversy depend entirely on the construction of certain deeds.

1. The entire right to the use of the water of the stream was originally vested in Sylvanus Rice, who in the year 1788 conveyed all his title thereto to Jonathan Hawks. In this deed the privilege was described " as a grist mill and saw mill, and the privilege of the stream, with liberty to use and improve said stream for mills of all sorts." This ancient right to the use of the water in the stream was, at the time of this grant, well described and designated by the use to which it was then appropriated. The grist mill and saw mill, being the only mills then erected, with the dam across the brook necessary to raise the head of water, comprehended the entire privilege. By the conveyance therefore of these two mills, the entire mill privileges passed to the grantee; and when either of the two was separately conveyed, such proportion of the whole right in the brook passed by the grant, as the water used to drive the mill conveyed bore to that used by the other mill. If, for example, the grist mill required as much water as the saw mill, a grant of the former would convey one half of the entire privilege; and so in a greater or less proportion, according to the amount of water necessary to carry the mill.

It follows, that when the grist mill was conveyed by Simeon

Crittenden, who had acquired a title to it through mesne con-veyances from Jonathan Hawks, by his deed to David Critten-den of March 16th 1816, the grant comprehended all the water in the brook except the saw mill privilege. This right is by mesne conveyances now vested in the plaintiff, subject, however to be diminished by such right of water as shall be found to have been conveyed to the defendants by the deeds under which they claim title. The right of the plaintiff includes the upper or reservoir dam, which was proved at the trial to have been occupied and used for more than fifty years as a reservoir dam for the grist mill below.

The argument of the defendants' counsel upon the construc-tion of the deed from Simeon Crittenden to David Crittenden of March 16th 1816, and also of the deeds of David Crittenden and David B. Crittenden, under which the plaintiff claims title, is founded on the fallacy that the conveyance of the grist mill passed nothing but the mill itself, and the water actually neces-sary to drive it. This would be so, if the title of the plaintiff rested on a modern grant of a grist mill, situated on a stream where there were several mills of different kinds, all drawing from the same level, and where there was only sufficient water to supply the power necessary to drive each mill.

But the argument has no application to a case like the present, where the right of a party is traced back to an ancient privilege, embracing the entire water in a stream, described and designated by the kind of mills to which it was originally appropriated. In such case, the conveyance of a grist mill or saw mill, *eo nomine*, passes the entire proportion or share of the water in the river be-longing to such mill. The plaintiff therefore, having by his deeds a title to the ancient grist mill, is the owner of so much of the water power and privileges in the stream as do not be-long to the ancient saw mill, which, at the time of the trial, was vested in Bishop, by deeds dated in the year 1854; and also sub-ject to such deduction or diminution, if any, as ought to be made therefrom by reason of the grant of a water power, made by the owners of the original saw mill and grist mill privileges, under which the defendants now claim title.

2. Their right is derived from deeds made by Silas Hawks and others to William Patch and Eugene Field, dated July 21st 1834. The grantors in these deeds undertook thereby to carve out a privilege lying between the upper or reservoir dam and the grist mill dam. The title of the defendants depends on the nature and extent of the privilege thus granted. It is a grant of a privilege described as follows: " Commencing at a certain permanent rock westerly of the centre of said brook, on which the upper dam belonging to the grist mill now stands; thence running on said brook to the dam which is occupied for supplying water to the grist mill, with the privilege of erecting buildings on the adjacent land to us belonging, for any purpose except for a grist mill and saw mill, for the occupancy and use of any other machinery carried by water power; reserving therefrom the right of taking water from the said upper dam to ourselves, also reserving to ourselves the land on said brook one hundred feet below said permanent rock."

The privilege thus conveyed was clearly limited by the " permanent rock " above and the grist mill dam below. No right was given to raise water above the rock. On the contrary, we think it was excluded by necessary implication. The rock is not only the upper boundary of their privilege, but the intent of the grantors to limit the right of the grantees by it is shown by the terms of the reservation. The object of the grantors was not to impair the power created by the upper dam. By reserving in the deed the use of the water raised by this dam to themselves, they intended to restrict the grant, so that the privilege conveyed should not disturb the flow of the water below the dam beyond the point fixed by the rock. The reservation could have no other object. The dam and the water raised by it belonged to the grantors. No part of it was included in the conveyance to Patch and others. It was not therefore a reservation, in the strict sense of the word, out of the thing granted; but was inserted for the purpose of excluding any right which might, under the general words of the grant, be claimed to flow back on the dam above the rock and thereby diminish the fall of the water. This construction is strengthened by the addi-

tional reservation of one hundred feet of the bank of the stream below the permanent rock. This was, in the strict sense of the word, a reservation of that which would otherwise have passed to the grantees under the previous terms of the grant, and was doubtless intended to save to the grantors a portion of the bank of the brook immediately below the dam, on which they might erect mills for the purpose of there using the water power created by the upper dam, and which they had intended to reserve by the previous clause in the deed.

3. We see no evidence in the case from which any abandonment of the right of water originally belonging to Jonathan Hawks can be inferred. The conveyance of Rice to White, relied on by the defendants to prove such abandonment, as well as that of Hawks to Urbane Hitchcock, under which the defendants claim title, were grants of land only on the stream, without any right to the use of the water. The mills and privileges were included in other conveyances, as appurtenances to other land, and passed by separate and independent titles under deeds previously made.

4. The parol evidence admitted at the trial as to the understanding of the parties concerning the extent of the right conveyed to Patch and others by the deed of July 1834, does not appear to have been objected to at the trial. But its admission was wholly immaterial, because the legal interpretation of the deed, unaided by extrinsic proof, conforms to the parol evidence of the intent of the parties in making and receiving the grant.

*Exceptions overruled.*